Court is in session. Our first case is 410162, in re. the Marriage of Matthew Billingsley. We have for the appellant John Schultz and William Bertram. Mr. Schultz. Thank you. May it please the court and counsel, we are here on an appeal from McLean County and in this appeal there is no issues as to child support, custody, or maintenance. What we're here on is property. Keep your voice up, please. And the division of property is what we're here on. The court Judge Suk presiding had before him the issue of what was the marital property and it consisted basically of only two assets in the main that were in contention. One was the cash value of a certain life insurance policy and also the value of the equity in the house. The respondent Patricia had already purchased another house before we tried the case, so possession is not an issue in this case either. It's just value and what do you do with the values that were found by the court. The only value on the insurance that was presented was by me and that was the cash surrender value shown on documents supplied by States Life Insurance Company. That came to $324,000 and some change. The respondent Patricia was a co-owner of that policy to the extent of one-third. They owned the policy outright. There were no ties between the policy and anything else other than each of them had an undivided one-third interest in it of $108,000 and some change. The issue then on the house was that there was a mortgage and the party stipulated as to the value of the house, fair market value, and there was approximately $29,200 in equity. The court transferred the house equity to Matthew since he was living there and Patricia had already purchased another house and gave Patricia the cash value of the policy, ostensibly saying that it was difficult to try to divide up the value. I'm not sure it's even value. It's difficult to divide the insurance, which is where we take issue. We take issue with Judge Suk's finding in that this court has already found in Mullins, Henry Mullins, that the insurance policy's value is its cash surrender value and I cited that in my brief. The conduct of the court in coming to its conclusion, though, is where discretion comes in. This is not an issue of where we're looking at manifest weight of the evidence. What does your opponent mean when he says that no testimony was presented by you as to the value of the policy other than the stated cash surrender value? Well, I take issue with him. The cash surrender value was document number 22 in the proofs. It was allowed into evidence by the trial judge and that clearly stated what the cash surrender value was under the indication. What did it say? What did it say about the buy-sell agreement or the testimony of John Donardi? Well, the buy-sell agreement, in our opinion, has nothing to do with this and I think that's where the trial court got into some difficulty. The buy-sell agreement does not command any purchase of insurance and the court will look at page 16 of my brief. I quote several questions and answers from Mr. Donardi on that very issue. He says, I'd have to agree that the buy-sell does not require insurance. He said that it is in the area of may purchase insurance. Actually, the buy-sell on page 3 of the buy-sell indicates that to facilitate the buy-out, the parties can buy insurance but doesn't say they have to. And, in fact, the buy-sell was entered into apparently on Christmas Day of 1992 and the insurance policy wasn't purchased until the spring of 1994. Who could change the beneficiaries on that life insurance policy? The parties who owned it, which would be Patricia and her two siblings. Mr. Donardi had nothing to do with that policy. He was not an owner. The company, Lynn Chevrolet, was not an owner. He gave each of his children who worked there salary and from that they chose to put it into a savings account, deduct it right up front from their salaries, and then that would be paying the premium each month. I think the respondent is trying to characterize that, that Mr. Donardi was behind all of this. True, he wanted it, but I think he wanted also the deduction for the salaries rather than making a gift of this to his children. And therein I think that was probably a bad decision on his part, but doesn't affect this case. There's no issue about whether this is a marital asset. No, and Judge Sue clearly found in his order, he says, this not only is a marital asset, but he said it has substantial value. But then he went on to say in his order that it was difficult to try and figure out, and where I think Judge Sue went awry here is he started asking questions from the bench of Mr. Donardi at trial. Well, what if she loses her job? Well, we're in the what if game, and this court's already found... Is that unfair? No, I don't think in this case because the what ifs don't get us anywhere except into raw speculation. And this court found about ten years ago in remarriage of Clayton that you cannot take what ifs or speculate into the future. You have to decide marital property at the time of either the disillusion or the trial if it's close in time. And we were fairly close in time to the time of disillusion. There's no issue on value. The respondent did not put in any evidence as to some other value. And the trial court properly found it's a marital asset, and it properly found that it had substantial value. It's what the judge did with it after that that has us here before this court. And I believe the judge abused his discretion in that There's a 72-28 split of the assets, and these parties don't have a lot in assets, and that's a huge differential. I think the mother's farm issue was a red herring simply because it has never produced a positive cash flow. It's a net negative, and it's only a few acres that he may receive on her passing, but that had not come to pass. And so I think counsel threw that in to cloud up the issues. I can't say what was in his head, but that's what it appeared to me to be. And so we just really believe that the buy-sell had no involvement in who owned or who had the value of that cash value. We've got $325,000 sitting there in a pool of money of which Pat had a third. She ended up with $108,000. My client walks away with equity in a house of half of $29,200, or approximately 15 grand. She walked away with half of that state's life policy value of about $55,000. The difference is 72-28. And I just believe that no one could really see or say that that was not a substantial injustice when 503D of the IMDMA clearly commands the court to divide the property in just proportions. And none of the 12 factors in 503D were applicable here. The judge didn't even touch on any of them. Well, just proportions does not mean equal. Is that correct? I agree. I agree. But it still has to be equitable. And how you get from 72 to 28 and that's equitable when there's only two assets in the marriage is beyond me. And so I really think that the judge let counsel's arguments about this buy-sell, which is off into the future. We don't know when that's going to happen, and try to push it into the policy. The policy stands alone. They could buy insurance. They didn't have to buy insurance. They were obligated under the buy-sell just to purchase shares on John's death. But in purchasing those shares, they used whatever funds they had at the time. Any problem that the children had to work at the dealership? The children all worked at the dealership. They didn't say that, that they had to work at the dealership. Well, if they wanted to have the option to purchase the shares, yes. Is that important? That is important only in that they all worked there. And at the time of trial, they were all working there. And as far as I know, they're still all working there. And we also have to keep in mind that John Dinardi is getting up in age. How old is he? He's in his 70s, late 70s. And I'm getting close myself, so I'm not saying that's really old. But actuarially, you know, the time is running. The situation here is also, I'd like to point out, there's a case called In Remarriage of Fairchild. And in Fairchild, the court was presented with not this particular fact situation, but it used a reserve jurisdiction approach. I'm not suggesting that. I think there should have been a transfer payment here, and it wouldn't have been that onerous to start with. We had some child support due, which could have been deducted. We had her share of half the equity in the house, which could have been deducted. And when you do that math, it comes down, she needs to transfer about $25,000 to my client. And that could have been done quite easily. There's no prescriptions against getting a policy loan. There's no prescriptions against assigning a portion of the cash value of the policy, either in the policy or in the buy-sell agreement. And consequently, I think it would have been a very easy thing for the trial judge to simply order that under 503I, which gives the court power to either order a sale or to do whatever is necessary to divide the property. So even if the judge had these reservations, and this panel believes that, well, maybe that's okay, then reserve jurisdiction is the only way to go. Because Pat, when she does get her one-third of that car dealership, has a very substantial asset. My client walked away with $15,000 in equity out of the house. And if Pat's dad died, and the shares of the dealership weren't worth $1.2 million, which is what the policy face value was, she pockets the difference. These were all marital assets. They were paid for out of her wages during the marriage. The parties filed joint income tax returns. And they were taxed on this money. Yet she walks away with that, and that, I think, is just a substantial injustice and abuse of discretion. Did she have to work at the dealership? Pardon? Did she have to work at the dealership? She worked at the dealership. Did she have to work at the dealership? Under the buy-sell, she could not have the option of purchase. But no, it's a free country. Work anywhere you want. But what happens if she doesn't? If she doesn't work there, she would give up her option to purchase one-third of the shares on John's death. That's kind of important, isn't it? It's important only in the fact that between the siblings and their father, there was this agreement. It's not important with respect to, is that going to disappear somewhere? And that's what Judge Suk delved into. What if she's no longer an employee? Well, what if, you know, the... What did you answer then? What's the answer? Well, the answer is, it is speculation. And under Clayton, I don't think you can go there. What happens in the future, nobody knows. And we have to divide the marital property, which the court found was marital property at the time of the trial. We can't put that off unless we reserve jurisdiction. If you reserve jurisdiction, obviously, if you follow the Fairchild case, then he gets his due someday in the future. And that's not favored simply because it postpones a judgment. It's just kind of hanging fire. Did you find any cases in other jurisdictions with this type of arrangement? No, not really. I think, and I was just telling my client, as far as I could tell, and I did not go over to State Farm's home office and use their extensive library, but nonetheless, I didn't find anything else, and I'm not aware of anything else. I think in this state, this may be a case of first impression. And at least as to that, I looked for insurance cases all through the Illinois decisions and only found a couple of cases, Fairchild being one of them. And there was the Mullins case, which is a fourth district case, which indicated that the insurance policy value is its cash surrender value. And that's what we presented at trial. If there are no other questions, the other issue here is the parties stipulated at a motion for a new trial and a review of the court's earlier ruling that we need some direction on what is the college expenses that should be paid. Judge Suk ordered that each parent was paid one-third of Ryan Billingsley's college expenses at a junior college. But the issue then came up, and the parties stipulated during argument in the trial court that the judge should rule on whether room, board, and transportation, which is extensive, it's from Lexington, Illinois, all the way to West Normal, which is approximately 20 miles each way, a 40-mile round trip, that those things are properly included in college expenses that Pat should cover in her one-third. The judge, when you look at the supplemental order, I don't think really touched on that, even though we asked the judge to rule on that. And so we're suggesting that this needs to be remanded back for that issue there, because the order is very, very unclear. It just says that its previous order shall continue on, which said the parties are to pay one-third of those expenses, but at the time we asked the judge to rule on the specifics of room, board, and transportation, and Ryan is living with his father, and their position is, well, Matt's got to pay those expenses, whether the boy lived there or not. Well, another Fourth District case, Marie Pauley clearly indicated, and that came right out of our circuit court, Judge Townley presiding, that whether you live at home or whether you live away, the expenses are the expenses and should be added in to whatever is the total for college expenses and tuition, books. Now we've got room, board, transportation, et cetera. Do you consider the fact that Patricia has custody of Lauren? That was reserved by the court, and the issue of college expenses was also reserved for Lauren, and Matt is paying child support to Patricia, so I don't see how that really affects this at all. So what we're asking this court is that it should find that Judge Suk abused his discretion with respect to the matter of distributing the two assets of the marriage and send either the case back on remand with directions that he needs to equitably distribute that property, and since the parties' incomes are relatively equal, there's just no 503D factors to consider there. Was there any evidence as to the cost of housing Ryan that was presented to the court? We showed what the mortgage was. He's living there, he's consuming power, he's consuming food, and he is having a house over his head, and what we were doing, and it's mentioned in the record, is Matt would send Patricia his totals for what she owed him each month, and she was refusing to pay those things, saying, yeah, you're going to have these whether he's there or not. Were those notices admitted in evidence? We did not submit documents, no. This was just testimony by the parties. Both parties testified. Dollar amounts? Dollar amounts were not discussed, no, as I recall. How does that help the trial court? The trial court, I think, was just asked to rule our room, board, and transportation properly includable into that. That's what we asked the trial court to do the day of the arguments. Thank you. Thank you. Thank you, counsel. Mr. Bertram? Good morning. May it please the court, counsel. My name is William Bertram, and I represent the Apple League, Patricia Billingsley. I think it's obvious we disagree with counsel's assertion that the insurance policy stands by itself. The BICEL agreement, which was entered into evidence, clearly encumbers the insurance policy. I think the word policy is mentioned all through the BICEL agreement. It's over and over mentioned in the terms, in its very terms. I think it's paragraph 2C or D. I think it's paragraph 2C states specifically that the policy proceeds are to be used exclusively by the participants to purchase the shares. And it goes on further to say that if one of the owners is not a participant, then they transfer their interests to another participant. So, an example here... Is this legal, this arrangement? Excuse me? Is this arrangement legal? It's by contract. I'm not aware of it. I'm not to speak to whether the IRS agrees with its interpretation. On that grounds, I'm not qualified to make that determination. But it's a contract, and I don't know of any prohibition in Illinois statutes. Have you ever seen one of these before? I'll be honest, no. It is unusual. Well, I guess I will say this. I've seen key man policies before, and that's for unrelated individuals. The unique factor here is all the participants are related. But I think it's clear by the intent, what was going on here, is the policy was there to guarantee that there were assets, that the estate, that John Denardy's estate, would receive money for the dealership, regardless of whatever else happened with his children. Are they in debt up to their ears? Are they bad business people? Whatever. They haven't accumulated the assets to purchase the dealership. But that there was something there to guarantee, okay, these funds are going to be used to purchase the shares. Is there any evidence that the children or stepchildren who were in the buy-sell agreement, that their salaries were inflated at all to cover the cost of insurance? I believe the testimony at trial for Mr. Denardy was that he paid into this savings account an amount equal to what it would cost to pay the premium. And then he in turn then, at the end of the year, divided that, the proceeding amount, or what he paid into the account, between the participants. And in this case, originally I think at one point there was three, then there was four, now I think we're back to three. And a W-2 was issued just for that portion, with Patricia working there. I believe the testimony, and I may be incorrect in this, but I believe the testimony was a separate W-2 was issued. It may have been added into Patricia's salary, but I thought that Mr. Denardy's testimony was that a separate W-2 was issued, withholding, was taking out, and that kind of thing. But it was clear from Mr. Denardy's testimony how that happened, was funds from the dealership went into the account, the account was then, there was a direct debit I believe, out of the account to pay the proceeds. Now the, and again I think it was clear from that term that you have to be a full-time worker at the dealership to participate, and there was no evidence presented that the employment of any of the heirs, or any of the participants, was guaranteed. I mean there was no separate employment contract presented. So really, I think according to the testimony of Mr. Denardy, the employees were at will. I mean these heirs, the children and stepchildren of Mr. Denardy, were there at his, by his good grace, and if they somehow displeased him somehow, they were out the door and they didn't participate anymore. And that, and that by, so that brings up the other, the other, I think the other thing Justice, or Judge Suit relied on, was not only by the terms, but also by the operation of the agreement. That this, that the policy was tied in, and it is speculative. Because the main, if you read the Bicell Agreement, it appears the main participant in this, in this is the oldest son, John, or John, I think he's referred to. He's no longer a participant, and he no longer owns the policy. So, there in its operation, you know, we, we can see that the agreement is contingent. It doesn't guarantee anything for the, for the children. They have to be working full time, they have to be satisfying whatever Mr. John Denardy, his expectations to participate here. To go on, the... On a note that probably is not relevant, I'm just curious, what was the comparison of salaries? She was only making, what, $38,000 or something? Comparison to the other participants? That wasn't entered in the evidence, we don't know. And I, and I don't know.  But to say that the, that Judge Suk said the policy was valueless, I think is wrong as well. I think Judge Suk looked at this, and he had to have signed some value. I mean, he didn't come out, I will admit, he didn't come out and say the policy is worth X. And then I'm going to give that to Patricia, so we have some idea of what, you know, ratio he was using. But I think he had to, by the record here, by the order, I think we have to assume he assigned some value. Because here we have a 19 year marriage, we have a husband that at present income made considerably more than my client. My client had custody of the minor child of the parties. And Justice, or Judge Suk awarded all of the marital equity to Mr. Billingsley. So, I don't think we can say that Judge Suk believed the policy was worth nothing. It had to be worth something, and I think he took into account that there was obviously a contingent value because of the tying in with the bi-cell agreement, that he assigned some value. And again, because of the situation of the parties, I think when Judge Suk applied the statutory factors, I think he determined, okay, it's a contingent value, it's worth something. I'm going to give that to wife. Husband, you take the equity. And I'm not going to say it's offset necessarily. The policy, you may consider the policy worth a little bit more. But that's supported by the record. Like I said, 19 year old marriage, husband making more than wife at present income. Both expecting inheritances. So, like I said, I think the relevant statutory factors were applied. I will take issue too with, I think the court here, we have two things going on here. First, we have Judge Suk determining a value. And then we have the distribution of the marital assets. When we're talking about valuation of the policy, I think that goes under the abuse of discretion standard. I had it clear here by the case law that we cited, it's an abuse of discretion. I don't think Judge Suk abuses discretion here. But when we turn to the distribution of the assets, that is a manifest way of the evidence standard. I will concede that. But again, I think Judge Suk properly applied the relevant statutory factors. Now, to go on to the college expense issue. The issue here, I believe is, was, and I apologize to the court. I'm not quite sure what the prior case law, are we talking abuse of discretion or a manifest way in this particular issue? But I think either way, either one we use. I think here, I think the decision was proper. If you apply the factors of Section 513, here, again, husband made $10,000 more than wife in present income. He got $30,000 of the equity in the marital home, which could be accessed right now. I disagree with counsel. I think looking at the policy, it is obviously contingent value when it's tied into the buy-sell agreement. And I disagree with counsel in this assertion that she could go out and get a loan on this policy. If you read the buy-sell agreement, the language is very clear. It has to be used exclusively for the purchase of the policy. And, again, it is not available to take a loan. So, wife had custody of the minor child. And, again, I will concede husband was paying child support. But, again, the parties previously were paying a third, a third, a third. And to assign more expense to my client that really wasn't an expense, I don't think is fair. Why wouldn't it be an expense? Because it's really, I mean, these, if you read, I mean, what counsel, or what the appellate argued, as to what the, this room and board expense that he's saying, the evidence was the mortgage payment. Well, regardless of where, you know, what Ryan is doing, you know, Mr. Billingsley has to pay the mortgage. I think my argument is with your statement, not, there's a question that still is out there whether or not anything was proven. But I think it's not only reasonable, but fact certain that, you know, if this young man is going to college, he's probably eating something somewhere. I would agree with that. And there's an expense associated with that. And I would agree, Justice Ampleton, because that's an actual out-of-pocket expense. Whether or not it was proven is a different question, but I'm going to your statement previous. But it appeared the appellant was trying to prove that just by giving the court the mortgage payment. And I don't think the mortgage payment qualifies. It's something that's going to have to be paid anyway. And frankly, the parties, I think it's just logical to assume that Ryan's living at home, and he's saving everybody money. Otherwise, if he's living on campus, that's a room and board expense that both parties were going to have to pay. He's at a community college. There isn't a campus, is there? I don't remember if he was Hartland or Parkland. I think it's Hartland. But he could be living in an apartment next to Hartland. He could have that expense, which both parties would have to pay.  What about this mileage? That would be an actual expense, not an out-of-pocket expense that I would concede. 513, I think that could be assigned by the court. Again, I have no quarrel with out-of-pocket expenses. It's just these expenses that were going to be paid anyway. And like I said, I think it's unfair that basically I think both... He doesn't have that out-of-pocket room and board expense. Why shouldn't my client share in that? Otherwise, the flip side, if he's going to the University of Illinois or some college that is charging, and he is living on campus, that's a room and board expense both parties would have to pay. He's not. That's obvious. And I think that ought to be the actual out-of-pocket expense. And again, that ought to be proven. In conclusion, justices, I would just say this. I don't believe the trial court abused its discretion in determining the valuation of the insurance policy. I think by its terms, by its operation, and the fact no other evidence was presented, and the fact I believe it's clearly from the judge's ruling there was some value assigned to the policy, that that was not an abuse of discretion to determine that the policy was difficult to value. And then we look to the determination of the property distribution. I don't believe that was against the manifest way to the evidence. Consider the relevant statutory factors, the length of the marriage, the income, the fact my client has custody, and the difference in having equity in a home as opposed to contingency value in a policy. I don't believe Judge Suk ruled against the manifest way. As to the college expense, again, the relevant statutory factors I believe were applied. This was not against the manifest way. It was not an abuse of discretion. And again, out-of-pocket expense is what should be a portion between the parties, not an expense that is going to be there anyway. Thank you. Thank you, counsel. Mr. Butler? Thank you. The FICEL, if it is read in its totality, is simply a tax avoidance scheme by Mr. Donardi to take the salaries, a portion of the salaries that he is paying the kids, the three children, to deduct from the gross revenues of Lynn Chevrolet. Is that a part of the problem for these people, or is that Mr. Donardi? Well, I think it bears, you know, we're looking at this FICEL, I think the whole thing bears on Mr. Donardi could have just gifted this policy to his kids, but he would have gotten, or would have received no tax deduction for it. It's cash out-of-pocket. The whole idea of the FICEL in the first place is if his wife survived him, she would have income from the policy to live on until she died. But if you read that FICEL very carefully, and that's Exhibit 23, you will find out that they're to buy out even if Mr. Donardi doesn't die first. That makes absolutely no sense, because they're going to receive it in his will anyway. Well, actually, his wife will receive it, and then she's going to leave it to her kids. So everyone still gets it in the end. The issue is we've got tax-free money in life insurance. Nobody pays income tax on that when received. It's a really big bonanza here. Is it a bonanza for the father or the children? It's a bonanza for the father. And to answer Judge Myerscough's question, is it legal? There was no consideration for this agreement. What did they get other than they promised they were going to buy the shares? They got nothing. They got wages, but that's not a consideration. That was due them for their work. And it's also a restraint on alienation. That policy, if you read the policy, it's all there in Exhibit 22. It has no restraints whatsoever on it. It is simply there. They own it. They bought it with their own wages. That is their property. You cannot then take some agreement off to the side that then restrains them from doing something without them getting a consideration back. If you stop working there, suddenly you lose everything you put into it. The party's paid taxes on it for 16, 17 years. That doesn't make sense. That's a confiscation of property without any consideration. And there were no separate W-2s for this savings account. They just got wages, and it's all shown on their W-2s. The policy actually that is referenced in the buy-sell is not this policy. This is state's life insurance. The policy referenced in the buy-sell is Phoenix Mutual. And Johnny, who was once in this deal, had his own policy. If you look at the state's life policy from March of 94, it only has three people on there as owners, and that is Patricia and her two brothers. Quickly, the incomes were equal. Pat was living with her live-in boyfriend in a house they bought. He paid the mortgage, etc., and he paid $9,600 a year on the mortgage and other house expenses, which relieved Pat of that money. And therefore, we don't have a dis-equal distribution here because of dis-equal incomes. There was no issue of any kind of maintenance here. It didn't apply. The party stipulated to that. And then finally, on the room board and transportation, I guess if we take counsel's statements at face value, then Matt has to subsidize Patricia by letting him live there free, and that's not the case. How are we going to show what he eats, etc., other than Matt serves her up a monthly cost for groceries and what have you? This happened for a period of time, correct? She was paying the first year, and the parties were exchanging notes back and forth, you all need this, you all need that, etc., and that's in the record. And then the second year, she just unilaterally decided she wasn't going to pay any more. And the judge still said, no, you need to pay a third. But he set out-of-pocket expenses, and that's where the rub was. And we just asked him, define what you mean by out-of-pocket because should the one-third of the mortgage during the time the boy was there be included. Thank you, counsel. We'll take this matter under advisement and recess until the next case.